IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02972-MEH

CODIS WEST MIMS, SR.,

     Plaintiff,

v.

T-MOBILE USA, INC.,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court is Defendant's Motion for Summary Judgment (ECF 41). In this case, Plaintiff has asserted claims under the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. §§ 12181 *et seq*. for failure to accommodate his disabilities and for unlawful termination based on his disabilities, and under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*. for unlawful retaliation. Defendant seeks dismissal of all of Plaintiff's claims, arguing the undisputed facts demonstrate summary judgment is proper. Plaintiff counters that genuine issues of material fact exist with respect to each claim. For the following reasons, the Court will grant in part and deny in part Defendant's motion.

## FINDINGS OF FACT

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter. Most of these facts are undisputed. In those instances in which a party purported to dispute a fact, the Court has cited to the record establishing either that no genuine dispute exists or the potential for a material factual dispute.

1.      Defendant T-Mobile USA, Inc. ("T-Mobile") is a wireless network operator.

2.      Plaintiff Codis West Mims ("Mims") began working for Metro PCS in July 2008 while living in Texas.

3.      Metro PCS later merged with T-Mobile.

4.      In 2015, Mims applied and was hired for the position of Regional Field Loss Prevention Manager for the Northwest Region, which covered stores in Colorado and Utah.

5.      Mims' territory was later renamed the Rocky Mountain market, and Mims' stores were limited to those in Colorado.

6.      Mims testified that he was told he was supposed to reside within his territory, and because "the position wasn't offered in Texas . . . [he] couldn't stay in Texas."  Deposition of Codis W. Mims, Sr., February 5, 2020 ("Mims Dep."), 156: 9-11, 158: 24 – 159: 4, ECF 41-1.

7.      Mims relocated from Texas to Colorado to take the position.

8.      T-Mobile promoted Lekiya Manzo to the position of Senior Loss Prevention Manager of the West in 2016.

9.      As part of her promotion, Manzo moved from Texas to California.

10.     Manzo supervised Mims' region among others on the West Coast and, thus, she was Mims' direct supervisor.

11.     Mims has acknowledged that T-Mobile's policy provides that excessive absenteeism, as determined in the company's sole discretion, may result in termination of employment.

12.     As the Regional Field Loss Prevention Manager, Mims was responsible for over 100 stores in Colorado.

13.     The essential functions of Mims' position included conducting investigations of fraud, theft,

and other alleged wrongdoing, which he typically conducted in the originating store; two types of trainings, one of which occurred for two weeks out of every month in person in the store and the other which occurred quarterly in Denver's corporate headquarters; and auditing the stores to evaluate whether they were in compliance with physical security standards.  Mims Dep. at 166: 5 - 170: 8; Job Description for Field Loss Prevention Manager, ECF 41-1 at 93-96.

14.     Mims performed these activities at each of his assigned stores.

15.     It was an expectation of his position that Mims visit at least ten stores each month.

16.     Mims spent a majority of his time traveling to his different assigned store locations.

17.     Mims stated that in his role, "if you're in your office, you're not really doing your job."

18.     Manzo and Mims frequently discussed work-related issues on the telephone.

19.     Mims suffers from, and has been prescribed medications for, a variety of permanent physical conditions, including diabetes, herniated disc, neuropathy, swelling in his lower extremities, sarcoidosis, and retinopathy.

20.     Mims is limited in his ability to work by a combination of the listed permanent physical conditions.

21.     In January 2018, Mims told Manzo that he had multiple doctors' appointments that required him to be away from work for several hours a day.  Deposition of Lekiya Tene Manzo, May 6, 2020 ("Manzo Dep.") at 40: 20 - 43: 9, ECF 41-2.

22.     Manzo informed Mims there were options available to assist him to take care of his health issues, including leave.

23.     Mims requested and was approved for intermittent FMLA leave beginning January 25, 2018.

24.     Shortly thereafter, Mims' health issues worsened and he applied for, and T-Mobile granted,

continuous leave under the FMLA. Mims had originally requested FMLA leave through August 23, 2018 but the granted FMLA leave period expired on May 15, 2018. In determining whether to grant Mims leave, T-Mobile reviewed medical documents reflecting diagnoses of "Sacrococcygeal disorders, not elsewhere classified R74.8 -Abnormal levels of other serum enzymes D86.0 - Sarcoidosis of lung D86.9 - Sarcoidosis, unspecified R74.0 - Nonspecific elevation of levels of transaminase and lactic acid dehydrogenase [LDH] R53 - Malaise and fatigue E11.9 -Type 2 diabetes mellitus without complications 279.899 - Other long term (current) drug therapy." *See* ECF 45-9. Mims' physician disclosed that he was suffering from "symptoms of weakness, dyspnea on exertion, cough, skin granulations, low back and left leg pain." *Id.*

25.     In addition to the FMLA leave, T-Mobile granted Mims company-approved leave from May 16, 2018 to June 11, 2018.

26.     Mims received all of the FMLA leave he requested.

27.     At the beginning of his leave, Mims made the decision to move back to Texas.

28.     The reasons he gave his supervisor, Manzo, for the move were: (1) he could no longer afford to live in Colorado due to his reduction in pay related to his leave, and (2) he needed assistance to travel to his medical appointments. Mims Dep. at  214: 14 - 217: 24.

29.     Mims attests that he "specifically talk[ed] to [Manzo] about moving to Texas" and that Manzo told him, do "[w]hatever you need to do and your doctors recommend that you do." *Id.* at 215: 4-25.

30.     Mims knew T-Mobile expected him to return to Colorado to work when his leave was over.

31.     On June 18, 2018, T-Mobile noted, "we will need a release from all treating providers before enabling [Mims] to return to work." ECF 45-10.

32.     On June 19, 2018, T-Mobile noted, "it is TMO understanding that [Mims'] residence continues to be in TX, his work territory is in CO. He will be required to return to his home territory to work." *Id.*

33.     Mims testified that he "underst[oo]d [his] presence in Colorado was where [he] would need to reside" for his continued employment with T-Mobile.  Mims Dep. 225: 16 - 226: 11.

34.     Neither Mims' job description nor any written policy at T-Mobile requires that a Field Loss Prevention Manager must maintain a permanent residence in any particular location.

35.     Manzo maintains a residence in Texas and a Texas driver's license in addition to her residence in California where she works for T-Mobile.

36.     Except for his physical presence in Colorado, Mims was able to perform the essential functions of his job when he was able to see his physicians and receive his prescribed medications.

37.     At the end of his leave, Mims was not able to submit all of his medical documentation required by T-Mobile to be released to return to work.  Manzo Dep. 53: 8-16.

38.     T-Mobile granted Mims a two-week leave extension, to June 25, 2018, to get his paperwork in order.

39.     Manzo was instructed not to grant Mims any "special" or "unauthorized" accommodations which did not originate from Mims' physicians.  Manzo Dep. at 59: 22 - 60: 5.

40.     Mims submitted forms from his doctors releasing him to return to work without any restrictions.

41.     Mims understood that, after his leave expired, T-Mobile expected him to return to Colorado full-time to resume his job duties.

42.     At the end of his leave, Mims "was willing to move back" to Colorado.  Mims Dep. 135: 4-6,

ECF 45-3.

43.     On June 25, 2018, Mims' first day back at work in Colorado, Mims met with Manzo, who

flew to Denver from California to "re-onboard" Mims and "get him re-acclimated to the area."

Manzo Dep. at 53: 17-25.

44.     That day, Manzo updated Mims on the "on-goings" in his territory since his leave began and

the two visited a few of Mims' assigned stores.

45.     According to Mims, the following events occurred on June 25, 2018:

> Manzo and I met for what I believed was to handoff and updating of the events and
> occurrences that transpired while I was on medical leave. The location for the first
> and second admission transpired while at the T-Mobile Engineering building located
> in Aurora Colorado. The first admission, "I don't think Colorado is the right place
> for you with your (Sarcoid) medical condition["] transpired during the morning
> session of our meeting in a closed door meeting room. The second admission
> transpired during our first break in which Manzo and I was [sic] in the breakroom
> retrieving refreshments standing next to the sink and counter area. Manzo stated[,]
> "with your (Peripheral Edema) swelling in the (lower extremities) legs will
> significantly affect your ability to perform your job duties (traveling from location
> to location).["] The final admission took place while she and I were driving to a
> location to perform a store visit (Town Center Mall) located [in] Aurora Colorado.
> While driving (I was the driver and she the passenger), she made the statement that
> she was afraid that my (Retinopathy) with loss of vision in my eyes may cause me
> to be involved in an accident which could open T-Mobile to litigation risk.

*See* Mims Dep. 231: 13 - 238: 25, ECF 41-1.[1]

46.     Manzo attested that she discussed with Mims her concerns saying, "Hey, like you told me

---

[1]In his Statement of Material Facts No. 18, Mims cites to his response to T-Mobile's
Interrogatory 16 for the "recounting of events" that occurred on June 25, 2018; however, in
apparent contravention of Fed. R. Civ. P. 33(b)(3) and (b)(5), the interrogatories do not appear to
be signed by Mims under oath.  *See* Responses, ECF 45-12.  Notably, in response to this
assertion of fact, T-Mobile states that it "does not dispute that number 18 in the Response recites
Mims' deposition testimony."  Reply at 7.  No party cites any portion of Mims' testimony in
which he recounts the events of June 25, 2018; however, the Court was able to locate the
testimony in the transcript submitted by T-Mobile.

about, you know, Colorado and cold weather not, you know, being a good thing for your condition. Do you think this is the right place for you to live?"  Manzo Dep. at 67: 6-24, ECF 45-11.   In addition, Manzo attested that "[Mims] had shown me his ankles in person and showed me photos of his ankles. And my question to him was, you know, 'Based on your swelling' – there was [sic] several times that he told me he was not even able to walk at all, because of the swelling [in] his feet and his ankles. And I asked him if he would be able to conduct visits and, you know, do the things that he was being asked to do with the swelling that he was having." *Id.* at 68: 7-15.  Further, Manzo testified that she spoke with Mims on his return to work and "asked him, you know, 'How – you know, how is your vision? Are you able to see?' because I knew that he would be driving. And my first comment to him was, 'I don't want you to get in an accident. I want you to be well, because you're already in pain and hurting. I don't want you to get in an accident, because that's putting your life at risk, other lives of people who are driving on the road, and it does put the company at risk.'" *Id.* at 68: 24 - 69: 19.

47.     Manzo understood that Mims was expected to perform all of the functions of the job to be allowed to return to work, if he did not have an accommodation requested by a physician.  Manzo Dep. 59: 14 - 60:10.  Manzo also understood that Human Resources Representative Lori Spencer determined, "The only way to return to an active status is to be healthy enough for the territory coverage and all duties of the job and be residing in Colorado." *Id.* at 60: 11-20.

48.     Manzo then left Colorado on or about June 25, 2018 with the expectation that Mims would continue working in Colorado on his typical schedule.

49.     When Manzo spoke to Mims on Friday, June 29, 2018, she learned he had returned to Texas.

50.     Manzo questioned Mims as to why he was not in Colorado as expected; Mims stated he did

not have enough money to live in Colorado and explained that he needed an additional month before he could return.

51.     Manzo called T-Mobile Senior Employee Success Partner Amanda Estrada for guidance.

52.     On June 29, 2018, Estrada confirmed in writing the "expectations" she had discussed with Mims regarding his employment.[2]  In a June 29, 2018 email, copied to Manzo, Estrada cited the following "expectations":

- The business is able to accommodate you taking time off from July 2-July 6. Please enter PTO for one day and unpaid time for the other days.

- You are expected to return to work in Colorado on Monday, July 9. If you're unable to return the time will be considered as a "no call, no show."

- While you're still employed, I will support you with a job search (time frame pending).

June 29, 2018 Email from Estrada to Mims, ECF 41-1 at 102.

53.     Manzo and Estrada advised Mims that he was required to be in Colorado, and if he could not return to work by Monday, July 9, 2018, T-Mobile would consider "the time [to be] a 'no call/no show.'"  *Id.*; *see also* ECF 45-5.

54.     Mims contends that another T-Mobile Field Loss Prevention Manager, Ryan Reilly, was not required to live in the area to which he was assigned,[3] but T-Mobile asserts that no Field Loss

_____

[2]Defendant cites "Exhibit A, Dep. Ex. 28 (p. 102)" for its description of a June 8, 2018 email; however, the email filed is actually one from Amanda Estrada to Mims on June 29, 2018 (*see* ECF 41-1 at 102); the Court found no copy of a June 8, 2018 email in the record.  Mims has admitted only to "the contents of the email" but, without a copy of the email, the Court cannot consider whether the facts presented are admitted or denied.

[3]Again, Mims cites to his Answers to T-Mobile's First Set of Interrogatories (ECF 45-12) and particularly to his response to Interrogatory 17; however, the copy provided does not demonstrate that Mims signed the responses under oath.  Thus, for this finding, the Court relies on Mims' deposition testimony at 266: 1 - 274: 24, ECF 41-1.

8

Prevention Manager lived outside his or her assigned area during the relevant time.

55.     Manzo made the decision to allow Mims an additional week, from July 2, 2018 to July 6, 2018, to return to Colorado to begin working.

56.     Estrada testified that T-Mobile "generally [does not] approve unpaid time off" but an "exception was made for [Mims] because we wanted him to have time to move back and be able to perform his job."  Estrada Dep. at 19: 17 - 20: 3.

57.     T-Mobile has a policy called "Unplug Time" under which an employee may request up to thirty days away from work as unpaid time, but there is no evidence that Mims made such request nor regarding whether the policy was in effect during the relevant time.  *Id.* at 26: 12 - 27: 5.  This policy does not allow an employee to work remotely.  *Id.* at 27: 6-8.

58.     T-Mobile does not have a work-from-home policy.  Its written attendance policy states: "Generally, if an employee is absent from work for 3 or more days without giving notice, the employee may be deemed to have abandoned [T-Mobile] employment. Excessive absenteeism or lateness, as determined in the Company's sole discretion, may negatively impact an employee's performance reviews and may result in performance improvement action up to and including termination."  According to Estrada, termination is not mandatory if an employee is absent from work for three or more days under the "no call/no show" policy.  *Id.* at 21: 18 - 22: 16.

59.     Mims attested that he received a call from Manzo during the first week in July 2018 asking whether he had found a place to live.  Mims Dep. at 241: 20-25, ECF 45-3.

60.     At some point during this period, Manzo spoke with Mims regarding his question "why he would need to reside in the area that he covered, and he mentioned that he should be able to perform his job duties virtually from Texas."  Manzo Dep. at 62: 7-16, ECF 45-11.  Manzo explained to

Mims that other employees were required to move and reside in the covered area and were not permitted to work remotely.  *Id.* at 63: 2-13.

61.     During this period, Estrada explained to Mims that he could not work remotely on a full-time basis and was required to continue living within his assigned territory.  ECF 45-1 at 6.  Estrada also offered to assist Mims in a job search if he wanted to look for open positions in Texas or elsewhere.

62.     Estrada did not recall that Mims identified any positions for which he was interested. Deposition of Amanda Estrada, May 14, 2020 ("Estrada Dep."), at 23: 10-13, ECF 41-3.

63.     Mims did not return to Colorado to work on July 9, 2018 or any time thereafter.

64.     Mims attested that, on July 10, 2018, he spoke by telephone with Manzo and asked whether he could rent a hotel room in Colorado while looking for a place to stay; Manzo responded, "That's not acceptable. [You] have to have a permanent address."  Mims Dep. 252: 15 - 253: 5, ECF 45-3.

65.     The same day, Mims received an email from Manzo stating, in part, "Beginning yesterday, you were a no call/no show. Three no call/no shows are considered job abandonment. If you are not back [in] Colorado, living and able to perform all loss prevention duties, you will have abandoned your role."  *Id.* at 254: 2-17.

66.     T-Mobile processed Mims' termination for job abandonment on July 11, 2018.

67.     Mims testified that he did not submit a request for accommodation after he returned to work in June 2018.  Mims Dep. at 146: 14-19, ECF 41-1.

68.     Mims testified that he did not stay in Colorado in late June 2018 because "financially [he] couldn't remain and stay there," and he did not return to Colorado on July 9, 2018 because he "didn't have the funds to return."  Mims Dep. at 230: 10-16, 244: 6-10, 245: 10-25, 249: 8-16, ECF 41-1.

**LEGAL STANDARDS**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

T-Mobile argues that no genuine issue of material fact exists as to whether it violated the ADAAA by failing to accommodate Mims and terminating his employment, and as to whether it violated the FMLA by retaliating against Mims for taking a medical leave of absence. For each claim, the Court will first determine whether T-Mobile supports its position with sufficient evidence and, if so, will proceed to evaluate whether Mims has raised material factual issues that must be resolved by a factfinder.

## I.    ADAAA Failure to Accommodate

T-Mobile contends that Mims was not a "qualified employee" under the ADAAA, because

he refused to return from Texas to Colorado to work, which was an essential function of his position as a Field Loss Prevention Manager for the Rocky Mountain (Colorado) market.  Additionally, T-Mobile claims it is undisputed that Mims never requested an accommodation when he returned from his leave.  Mims counters that a factual dispute exists as to whether the physical presence requirement was also a "permanent residence" requirement or whether Mims could have temporary living arrangements in Colorado.  Mims argues that T-Mobile has not, as a matter of law, established that the requirement to be physically present in Colorado was essential to the Loss Prevention Manager position.  T-Mobile replies that Mims raises no material factual issue as to whether he requested an accommodation after he returned to work in June 2018.

For a failure-to-accommodate claim, a plaintiff need not demonstrate discriminatory intent.  Rather, "any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'—*the accommodations are only deemed reasonable (and, thus, required) if they are needed **because of the disability**—*and no proof of a particularized discriminatory animus is exigible."  *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017) (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999)) (emphasis added).  Thus, at summary judgment, "the employee must make an initial showing that '(1) she is disabled; (2) she is "otherwise qualified"; and (3) she requested a plausibly reasonable accommodation.'"  *Id.* at 1050 (quoting *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012)).  "Once the employee produces evidence sufficient to make a facial showing on . . . her prima facie case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer."  *Id.* (citing *Smith v. Midland Brake,*

*Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999)).  "If the employer does either of the above, summary judgment will be appropriate for the employer unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of . . . her prima face case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements."  *Id.*

Here, T-Mobile concedes for purposes of the present motion that Mims suffers from "disabilities."  The Court agrees that the evidence reveals no genuine issue of material fact as to whether Mims requested a "plausibly reasonable accommodation" that was not granted by T-Mobile. Mims points to his "request" to Estrada on June 29, 2018 for an additional thirty days in which to find a Colorado residence, but his testimony reflects that he did not seek the additional time as an accommodation "because of his disability" (*see id.* at 1048); rather, Mims needed the time to "find a residence and get his personal effects relocated back to Colorado."  Mims Dep. 242: 1-10; *see also* Compl. at ¶ 12 ("After explaining his situation and fresh return to work, Plaintiff was asked by Estrada what time frame would be required to find a residence and get his personal effects relocated back to Colorado. Plaintiff advised that he believe 30 days would be reasonable.").  Moreover, to the extent Mims argues that T-Mobile ordered him to return to Colorado to perform his work and, thus, he was denied any request to work remotely from Texas (*see* Manzo Dep. at 62: 7-16, ECF 45-11), the evidence similarly does not reflect that Mims made such request to accommodate his disabilities.

Even if Mims' requests to work remotely and/or for an additional thirty days in Texas could be construed as needed for Mims' disabilities, there is no evidence that Mims "inform[ed][T-Mobile] of the '*expected duration of the impairment* (not the duration of the leave request).'"  *Punt*,

862 F.3d at 1051 (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1129-30 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 35 (2001)) (emphasis in original).  "Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future and therefore whether the leave request is a 'reasonable' accommodation."  *Id.*; *see also Winston v. Ross*, 725 F. App'x 659, 663–64 (10th Cir. 2018).

Finally, Mims asserts that "T-Mobile indisputably required Mims to have a full duty release in order to return to work. 100% healed policies violate the ADAAA's requirement for an individualized assessment."  Resp. at 15 (citing seven out-of-circuit cases).[4]  Mims cites to no evidence demonstrating his position is "indisputable."  The Court has reviewed the record and finds no such policy; Manzo's testimony reflecting her understanding that Human Resources Representative Lori Spencer determined, "The only way to return to an active status is to be healthy enough for the territory coverage and all duties of the job and be residing in Colorado" (Manzo Dep. at 60: 11-20) does not constitute a policy that Mims (or any other T-Mobile employee) must be 100% healed before returning to work; there is no evidence that "healthy enough" equals 100% healed or that the HR representative quoted or referenced a written policy or spoke for the company. Furthermore, the document reflecting notes (purportedly by T-Mobile employees) regarding Mims' leave of absence states that "we will need a release from all treating providers before enabling [Mims] to return to work." *See* ECF 45-10.  However, requiring the submission of a medical release

---

[4]Mims raises this argument with respect to his failure-to-accommodate claim; the Court recognizes that, typically, the argument is raised when considering whether an employee is qualified to perform the essential functions of the job, but will include an analysis of the argument in this section consistent with how it was raised.

does not necessarily equate to a requirement that "employees [ ] be 100% healed before allowing them to resume work." *Gardenhire v. Manville*, 722 F. App'x 835, 839 (10th Cir. 2018). There is no evidence in this case indicating that T-Mobile required Mims to submit a medical release that reflected he had *no* work restrictions. As it turns out, the evidence reflects Mims was released to return to work with no restrictions; in addition, he requested no accommodation for his disabilities by which T-Mobile might engage in an "individualized assessment." Thus, even if T-Mobile had a 100% healed policy, it does not appear that Mims was or has been injured by it. *See id.* (100% healed policies are considered discriminatory when they "permit[ ] employers to substitute a determination of whether a qualified individual is 100% healed from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation") (quoting *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999)).

The Court concludes, on this record, that no reasonable juror could find T-Mobile failed to accommodate a plausibly reasonable accommodation requested by Mims based on his disabilities. Accordingly, the Court will grant T-Mobile's motion for summary judgment on Mims' failure-to-accommodate claim.

## II.  ADAAA Discrimination by Termination

T-Mobile asserts that no genuine issue of material fact exists as to whether Mims was a qualified individual with a disability and whether his employment termination was due to his disabilities. Mims counters that he could perform the essential functions of the job with and without accommodation and that T-Mobile fails to demonstrate that permanent residence in Colorado is an

essential function of the job.  Further, Mims argues that material factual issues exist as to whether T-Mobile fired him because he was disabled.

At summary judgment, Mims has presented indirect circumstantial evidence that he was fired because of his disabilities; therefore, the *McDonnell Douglas* burden-shifting framework governs the analysis of this claim. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).  The framework involves three elements:

> (1) the plaintiff must establish a prima facie case of discrimination ... ; (2) the defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action; and (3) the plaintiff must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual.

*Smothers*, 740 F.3d at 538.  To establish the first *McDonnell Douglas* element—a prima facie case—a plaintiff must present evidence that "(1) he is disabled within the meaning of the ADAAA; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he was terminated 'under circumstances which give rise to an inference that the termination was based on his disability.'"  *Id.* at 544 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  Here, T-Mobile argues that Mims fails to demonstrate genuine issues of material fact as to the second and third prongs of his prima facie case.

A.      Qualified to Perform Essential Functions

With respect to the second prong, the burden is on the plaintiff to show his qualification for a job, which is a mixed question of law and fact.  *Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 743 (10th Cir. 2013) (citing *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009) and *McKenzie v. Dovala*, 242 F.3d 967, 975–76 (10th Cir. 2001)).   A job function is

"essential" if it is fundamental to a position and all employees in the position must perform it.  *Id.* (citing *Hennagir*, 587 F.3d at 1262).  In determining whether a particular function is essential, courts may consider the employer's judgment as to which functions are essential and written job descriptions.  *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004); *see also* 29 C.F.R. § 1630.2(n)(3) (listing other factors).

According to T-Mobile, Mims "is not a qualified individual under the [ADAAA] because he was unable to perform an essential function of his position, namely, being physically present in Colorado to work at his assigned stores."  T-Mobile argues that Mims understood the requirement to be physically present in Colorado as demonstrated both by his testimony and by his actual move from Texas to Colorado when he first accepted the Loss Prevention Manager position.  According to T-Mobile, all similarly situated employees are required to be physically present in their covered areas, including Mims' supervisor, Manzo.

Mims counters that a similarly situated employee, Ryan Reilly, who is also a Field Loss Prevention Manager and who has worked at T-Mobile since 2007, lived in Eastern Washington but his covered territory was in Utah.  Mims understands that Reilly "worked out of the Bellevue, Washington office" and he "was allowed to travel to and from his region to conduct store visits and investigations when required at the company's expense."  Resp. at 6 n.46.  Mims also attested that he knew Reilly and never knew him to have "dealer stores" in Washington.  Mims Dep. 274: 4-24.  According to Mims, Matt Cussins was the Field Loss Prevention Manager for Washington and "you're not going to have two regional managers in the same area.  Both these guys work out of the corporate office.  It does not happen. They don't -- you don't share areas."  *Id.*

18

T-Mobile replies that Reilly, in fact, was responsible for stores in both Eastern Washington and Utah.  Manzo attests that she was Reilly's supervisor from 2016-2020 and, from 2015-2016, he "was responsible for stores located in Northwest and Southwest, including in Eastern Washington"; in 2016, T-Mobile added corporate stores in Utah to Reilly's territory and, thus, his territory became Eastern Washington and Utah.   Declaration of Lekiya Manzo, July 14, 2020, at ¶ 8.  According to Manzo, "at no point did Mr. Reilly live outside of the territory for which he was assigned."  *Id.*

The Court finds that, through his deposition testimony, Mims has raised a genuine issue of material fact as to whether being physically present in Colorado was an essential function of his position.  Again, a function is essential if "it is fundamental to a position and *all employees in the position must perform it*."   *Koessel*, 717 F.3d at 743 (emphasis added).   While Mims has conceded his understanding that T-Mobile required him to return to work in Colorado after his leave, he attests, based purportedly on his personal knowledge, that another Field Loss Prevention Manager was permitted to live in Washington while the manager's covered territory was in Utah.  T-Mobile characterizes Mims' testimony as "self-serving," but does not explain how it is so, and the case cited is factually distinguishable.  *See* Mot. at 13-14 (citing *Mason*, 357 F.3d at 1121 (concluding the employee's testimony describing what she believed were the essential functions of the job was "self-serving")).   The Tenth Circuit has expressed its reluctance "to allow employees to define the essential functions of their positions based solely on their personal viewpoint[s] and experience" (*id.* at 1122), but nothing precludes consideration of an employee's testimony as to his personal knowledge and experience regarding which duties and responsibilities were actually performed by similarly situated individuals.

T-Mobile's evidence rebutting Mims' position includes Manzo's testimony that Reilly was, in fact, responsible for stores in both Washington (where he lived) and Utah.  In addition, during his deposition, Mims was shown a "map" purportedly reflecting T-Mobile's "Branded Retail Markets"; however, Mims disputed the information contained in the map and, thus, its authenticity.  Mims Dep. 274: 4-24; ECF 41-1 at 103.  The Court is not permitted under Fed. R. Civ. P. 56 to weigh the evidence and make findings on the credibility of witnesses.  *See Starr v. QuikTrip Corp.*, 655 F. App'x 642, 644 (10th Cir. 2016) ("The court may not make credibility determinations or weigh evidence, which are functions of the jury, not the judge.").

B.   Termination Based on Disabilities

With respect to the third prong, Mims must show that T-Mobile "terminated h[is] employment under circumstances giving rise to an inference that the action was based on h[is] disability." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001).  To meet this burden, Mims must "present some affirmative evidence that disability was a determining factor in the employer's decision." *Id.*  Mims' burden in this regard is "not onerous," but it is also "not empty or perfunctory." *Id.*  Courts must engage in a totality-of-the-circumstances approach in determining whether a plaintiff has raised the necessary reasonable inference of discriminatory motive to establish a prima facie case of discrimination. *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1156 (10th Cir. 2008) (citing *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736 (10th Cir. 1999)).

Mims points to Manzo's "discriminatory" comments regarding his condition and ability to perform his job duties, saying the temporal proximity between the comments and his termination demonstrates an inference of discrimination.  Specifically, Mims identifies three statements made by Manzo on June 25, 2018, his first day back at work following his leave: (1) "I don't think

20

Colorado is the right place for you with your (Sarcoid) medical condition"; (2) " your swelling in the legs will significantly affect your ability to perform your job duties (traveling from location to location)"; and (3) while Mims was driving, Manzo made the statement that she was afraid his loss of vision may cause him to be involved in an accident, which could open T-Mobile to litigation risk. T-Mobile counters that Manzo's remarks were made solely out of concern for Mims' well being and, otherwise, may be considered only as stray remarks.

In analyzing the third prong of an ADAAA prima facie discrimination case, the Tenth Circuit has held that a plaintiff correctly pointed to the temporal proximity between her discussions with hospital superiors about her physical injuries and requests for time off and her eventual separation from the hospital as something that could both satisfy the third element of the prima facie case and "lend support to the pretext analysis." *Tadlock v. Marshall Cty. HMA, LLC*, 603 F. App'x 693, 702–03 (10th Cir. 2015) (citing *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000)); *see also Trujillo*, 524 F.3d at 1157 (considering temporal proximity between a plaintiff's medical "relapse" and the adverse actions for an ADAAA association discrimination claim). Such consideration is relevant to a determination whether an adverse action occurred under circumstances giving rise to an inference of discrimination. *See id.*

Here, Manzo admits to making the same or similar comments alleged by Mims, but T-Mobile contends that Manzo's comments were motivated solely by her concern for Mims' health and well-being. The Court finds it is not permitted to make a determination as to Manzo's motivation in a Rule 56 analysis.[5] *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th Cir. 1998) (Tacha,

---

[5]Mims testified that he spoke with Manzo about his medical condition during his leave and, "at the time," he believed Manzo "was concerned about [him] and wanted to make [sure he was] okay." Mims Dep. 213: 3-9, ECF 41-1. The Court finds this testimony is not inconsistent

J. concurring) ("In an employment discrimination suit, the factfinder's task is to determine whether an employer was motivated by discriminatory animus, but the factfinder can only consider the evidence if the evidence is legally sufficient to support such a finding of discrimination.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

T-Mobile also characterizes Manzo's comments as "stray remarks," citing the opinion in *Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1252 (D. Colo. 2012), *aff'd*, 550 F. App'x 596 (10th Cir. 2013). "For a statement to constitute evidence of discrimination (rather than a 'stray remark'), the plaintiff must show that it was 'made by a decision maker, and that there was a nexus between the discriminatory statement[ ] and the decision to terminate.'" *Id.* (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998)). In this case, no party disputes that Manzo was a (if not the) decision maker in Mims' termination of employment, and Mims demonstrates a "nexus" by pointing to the time between Manzo's comments on June 25, 2018 and his termination on July 11, 2018. *Cf. Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (finding a comment to be a "stray remark" where "[t]he remark was made by only one of the four individuals that decided to terminate [plaintiff], and no overt racial animus is attributed to any of the other decisionmakers. Further, the remark was temporally remote [approximately nine months] from the termination"). Also of note, although it is undisputed that Mims was a "no call/no show" for three consecutive days in contravention of T-Mobile's attendance policy, T-Mobile's HR Manager testified that termination under such circumstances was not mandatory. Estrada Dep. at 6: 11-17; 21: 18 - 22: 16.

---

with a later belief that Manzo's comments could be discriminatory.

The Court concludes that Mims has met his prima facie burden to produce affirmative evidence demonstrating that his disabilities were a determining factor in his employment termination.  Under the *McDonnell Douglas* framework, T-Mobile must identify a legitimate, nondiscriminatory reason for the termination; T-Mobile states that Mims was terminated because "he refused to return to work in Colorado, his assigned territory."  Mot. at 20.  The Court finds T-Mobile has met its burden.  Therefore, Mims must present evidence raising a genuine issue of material fact as to whether T-Mobile's reason is a pretext for discrimination.

Mims points not only to Manzo's comments made only two-and-a-half weeks prior to his termination (at which time Mims felt that Manzo was "testing" to determine whether he was physically able to perform his job duties (Mims Dep. 233: 1-14)) and to the fact that termination is not mandatory for three "no call/no shows" at T-Mobile, but also to his understanding that another Field Loss Prevention Manager, Ryan Reilly, was permitted to live in a state outside of his assigned territory.  As set forth above, the Court finds Mims has raised a genuine issue of material fact as to this evidence.  Moreover, Mims testified that he intended to move back to Colorado after his leave (but did not know when he would return so did not commence a search for a residence in Colorado); when he returned to Colorado, he worked during the week of June 25, 2018 and started looking online for a residence; he traveled back to Texas on June 29, 2018 after work that day because of financial difficulties in staying at the hotel; he intended to return to Colorado on Monday, July 2, 2018 but spoke with Manzo and Estrada about his financial difficulties on June 29, 2018 and they agreed to allow him an additional week to remain in Texas during which Mims was to seek a Colorado residence; during that week, Mims attempted to find a residence by using online resources, including looking at monthly rates at hotels, and contacted friends and family asking to borrow

23

money, but he received none; on July 9, 2018, the day Mims was required to return to work in Colorado, Mims sent an email to Manzo "expressing [his] inability to return to Colorado"; on or about July 10, 2018, Manzo informed Mims that living in a hotel would not be permitted and he needed to have a permanent address in Colorado; on July 10, 2018, Manzo emailed Mims warning him that if he was "not back in Colorado, living and able to perform all loss prevention duties, [he] will have abandoned [his] role"; in the same email, Manzo informed Mims that she had "set up an out-of-office email account so that people" would "reach out to her for business critical items" (Mims explained that he had been working remotely for T-Mobile until that point); and, on July 11, 2018, Mims did not return and T-Mobile processed Mims' termination of employment.  Mims Dep. 239: 17 - 255: 9, ECF 41-1.

The Court concludes that, if Mims' testimony is true that he continued performing his duties as a Field Loss Prevention Manager from the time he returned from leave on July 25, 2018, he intended to return to Colorado on July 2, 2018 but T-Mobile allowed him to remain in Texas for an additional week, T-Mobile's attendance policy did not mandate that an employee be terminated after three "no call/no shows," and T-Mobile permitted a non-disabled Field Loss Prevention Manager to reside in a state outside of his assigned territory, and if Mims' testimony is coupled with Manzo's comments, then a reasonable jury could find T-Mobile's reason is a pretext for unlawful discrimination and Mims would be entitled to judgment on his ADAAA discrimination claim.  The Court will deny T-Mobile's motion in this respect.

## III.   FMLA Retaliation

T-Mobile argues that Mims fails to demonstrate a causal connection between Mims' protected activity of taking FMLA leave and his termination of employment.  Mims agrees that

24

"[t]he question for the Court is whether there is a triable issue regarding causation" and counters that he establishes causation by demonstrating a "close temporal proximity" between his leave and his termination.  T-Mobile replies that Mims fails to acknowledge Tenth Circuit law finding that temporal proximity is measured from the time the employer knows of an employee's intent to take FMLA leave.  The Court agrees with T-Mobile.

To state a prima facie case of retaliation, Mims must show that: (1) he engaged in a protected activity; (2) T-Mobile took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.  *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).  T-Mobile assumes for purposes of this motion that Mims meets his burden to demonstrate the first and second prongs.  "To establish the third element of a prima facie case of retaliation, [Mims] must show a causal connection between [his] protected activity of taking FMLA leave and [T-Mobile's] decision to terminate [his] employment."  *Id.*  Temporal proximity between protected conduct and a termination is relevant evidence of a causal connection; "however, [ ]a plaintiff may rely on temporal proximity alone only if 'the termination is very closely connected in time to the protected activity.'"  *Id.* (quoting *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999)) (emphasis in original).

In *Metzler*, the Tenth Circuit found that a period of four-to-six weeks between the time the plaintiff announced her intent to invoke her FMLA rights, the start of her leave, and her termination was "very closely connected in time."  *Id.* at 1172.  Another court in this District cited *Metzler* in finding, "[t]he Tenth Circuit has indicated that the temporal proximity clock begins at the time that the employer knew of the employee's plan to take FMLA leave.  *Salemi v. Colorado Pub.*

*Employees' Ret. Ass'n*, 176 F. Supp. 3d 1132, 1156 (D. Colo. 2016), *aff'd*, 747 F. App'x 675 (10th Cir. 2018) (citing *Metzler*, 464 F.3d at 1171).  This Court agrees that temporal proximity must be measured at the time the employer knew about the protected activity.  The *Salemi* court determined that a five-month period between the employee's notice to the employer of her intent to take FMLA leave and her termination was "not sufficiently close in time to establish a causal connection."  *Id.* at 1157.

In this case, it is undisputed that Mims requested and received intermittent FMLA leave in January 2018 and requested and received continuous FMLA leave from February 15, 2018 to May 15, 2018.  The time period from February 15, 2018 (the latest date on which T-Mobile had knowledge of Mims' request for and approval of FMLA leave) to July 11, 2018 is approximately five months and, consistent with *Salemi*, not sufficiently close in time to establish a causal connection for purposes of demonstrating the third prong of a prima facie FMLA retaliation claim. Mims offers no other evidence supporting his retaliation claim; accordingly, the Court must conclude that Mims has failed to raise a genuine issue of material fact as to whether T-Mobile retaliated against him in violation of the FMLA.  The Court will grant T-Mobile's motion and dismiss the third claim for relief.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [filed July 20, 2020; ECF 41] is **granted in part** and **denied in part**.  Mims' first (ADAAA failure-to-accommodate) and third (FMLA retaliation) claims are dismissed, and his second claim for ADAAA discrimination in his termination of employment will proceed to trial.

SO ORDERED.

Dated at Denver, Colorado, this 30th day of September, 2020.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge